**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DEREK A. JONES,

      Plaintiff,

      v.                          Civil Action No. 12-1454 (JEB)

DISTRICT OF COLUMBIA WATER
AND SEWER AUTHORITY,

      Defendant.

## MEMORANDUM OPINION

For over a decade, Plaintiff Derek Jones, who is black, worked as a recruiter for the

District of Columbia's water utility – the Water and Sewer Authority.  He maintains that WASA

terminated him in 2011 in retaliation for speaking up about what he believed to be discriminatory

practices.  The utility counters that Jones was fired for cause, pure and simple, and that his

employment file – replete with three years of middling performance reviews and a string of

documented reprimands – demonstrates the legitimate, non-retaliatory reasons for his removal.

In addition, WASA argues that the practices Jones opposed were not of a kind protected by the

civil-rights laws.  In now considering Defendant's Motion for Summary Judgment, the Court

agrees that Jones has failed to establish a genuine dispute of material fact sufficient to warrant a

trial.

## I.    Background

The facts here are set forth in the light most favorable to Plaintiff.  WASA hired Jones as

a recruiter in 1999.  See Def. Response to Plaintiff's Statement of Material Facts (Resp. to

PSMF), ECF No. 73-1, ¶ 2; MSJ, Attach. 4 (Deposition of Derek Jones) at 11:19-12:2.  From the

parties' silence on the matter, the ensuing nine years were apparently uneventful.  But in the second half of 2008, right around the time when a new supervisor stepped in to oversee Jones, circumstances began to change for the worse.

    A.  <u>Plaintiff's Disciplinary Record</u>

In August 2008, WASA assigned Denyse Jeter-Williams, who is also black, to supervise Jones in her capacity as Manager of Employment Services.  <u>See</u> MSJ, Attach. 2 (Def. Statement of Material Facts) ("DSMF"), ¶ 2; Jones Depo. at 57:15-16.  During a staff meeting in October 2008, Jeter-Williams disciplined Jones for using the word "ass," which she believed was profane, and instructed him that it should not be used in the workplace.  <u>See</u> DSMF, ¶ 4; MSJ, Attach. 11 (Note to File of Oct. 23, 2008) at 1; Jones Depo. at 272:2-7 ("I said -- just casually I said, 'Man, we need to get off our ass and just, you know, get busy.' And that's the content [*sic*] in what I used it in.  And she basically said, 'Well, there will be no cursing in my staff meetings.'").  He responded by disputing whether "ass" was, in fact, profanity, since "they use the word ass on the TV, on the radio, on everything."  Jones Depo. at 272:9-10.

After that meeting and in short succession, Jeter-Williams placed three different memoranda in Jones's employment file documenting what she viewed as insubordinate behavior and charging that he did not communicate effectively with his supervisors.  She issued the first memo in December 2008 and gave him a formal warning in January 2009.  <u>See</u> DSMF, ¶¶ 5-6. The same concerns were then echoed in her May 2009 mid-year performance evaluation of Jones.  <u>See</u> <u>id.</u>, ¶ 8.  He acknowledges that these were his evaluations, but disputes Jeter-Williams's characterization of his behavior and performance.  <u>See</u> Plaintiff's Resp. to DSMF, ECF No. 67, ¶¶ 5-8.

At the end of 2009, Jeter-Williams gave Jones his end-of-year performance review.  <u>See</u>

DSMF, ¶ 9. She rated his overall performance as "Level 2 – Meets Expectations" but graded his work in the "Dependability and Responsiveness" category as "Level 1 – Fails to Meet Expectations." Id.

The following year's performance review took on a slightly more positive tone. Jeter-Williams again rated Plaintiff's overall performance as "Level 2 – Meets Expectations," though she also noted that "Derek sometimes is not aware that he has information which could affect his supervisors' work. I encourage him to routinely provide his supervisor with updates on his work to ensure that he keeps his supervisor informed." ECF No. 70 (Opposition), Attach. 2 (Declaration of Daniel Linden), Exh. 3 (November 2010 Performance Evaluation) at ECF p. 10.

In April 2011, Jeter-Williams again documented, in a mid-year performance review, what she viewed as two key shortcomings in Jones's performance: (1) failing to convene "Staffing Strategy Session[s]/Phone Conversation[s]" with WASA hiring managers when he is assigned a new vacancy to fill, and (2) routinely failing to "provide [Jeter-Williams] with a copy of [the monthly Budget/Recruitment report for Compensation] on a consistent basis, which is a primary requirement of [his job]." MSJ, Attach. 16 (April 2011 Memorandum from Jeter-Williams to Jones) at 2.

On the first issue, Jones's deposition testimony corroborates Jeter-Williams's assessment that such meetings or conversations were part of his job obligations. See Jones Depo. at 323:14-18 (agreeing that he was "required as part of [his] job duties to conduct a strategy meeting with hiring managers when [he] began recruiting on a new posting"). But, in his view, it was unnecessary to perform these tasks consistently. During his deposition, he recounted a discussion he had with Jeter-Williams after reading his April 2011 performance review in which he told her:

> [L]ike I explained to you, some positions are repetitious, and they
> never change.  And the hiring managers that I've been working with
> for several years, and we've already establish a rapport that they're
> looking for.  So in every case, a [meeting], . . . depending on the
> position, is not necessary at the request of the manager.

Id. at 326:2-9.

As to the second issue – the sending of the monthly budget report – a terse email

exchange between Jeter-Williams and Plaintiff several months after the April 2011 performance

review illustrated the source of her frustrations.  On July 8, 2011, she wrote Jones to obtain his

portion of the monthly report: "Derek, Please forward me the June GM Report asap."  MSJ,

Attach. 6 (July 8, 2011, Email Chain).  Ten minutes later, Jones responded.  Instead of sending

her the report directly as requested, he informed her where she could locate it herself:

> Denyse, This report is in the I Drive under Staffing, Report.  It is
> titled as the subject of this email [Staffing Report-Budget Report 06-
> 30-11].  This is what you requested and I've continued on a monthly
> basis to save the report in this drive.  Let me know if you have any
> questions.

Id.  After thanking Jones for the report in response, Jeter-Williams then explained:

> Please note that I also asked you to send me the report when you
> complete it.  You save it to the "I" drive for future reference, but I
> need this report each month as soon as you complete it.  Currently I
> am not aware when you've completed it which has created problems
> for me.  We've discussed this several times.

Id. (emphasis added).

More reprimands followed.  In August 2011, Jeter-Williams's own supervisor, Arthur

Green (WASA's Director of Human Capital Management), admonished Plaintiff by letter,

commenting that his "disrespect of [Jeter-Williams] has become . . . standard operating

procedure" and directing him to "start showing respect of your chain-of-command."  MSJ,

Attach. 17 (Aug. 9, 2011, Letter from Arthur Green to Derek Jones).

The next month, Jeter-Williams delivered yet another memorandum to Plaintiff concerning "work habits" that she considered "unacceptable," including "insubordination."  Id., Attach. 18 (Sept. 8, 2011, Memorandum).  In it, she described several recent examples of Plaintiff's behavior – none disputed – that she considered problematic.  See Pl. Rep. to DSMF, ¶ 15; Jones Depo. at 348:5-20.  One was informing her by email at 8:15 a.m. that he would be absent from work to attend a "Defensive Driving training course" that same day.  See Sept. 8, 2011, Memo.  As she explains in the memo, his late notice was problematic not only because WASA's written policy requires its employees to obtain advance approval before participating in a training, but also because she had scheduled a training "for all Staffing employees for that same date . . . of which [Plaintiff] had notice."  Id.  Another was Plaintiff's directly requesting WASA's facilities team to reconfigure his cubicle without her authorization.  Id.  When she informed him that he should have first obtained her approval, he "responded, 'The only thing that I need you for is to sign my leave slips.'"  Id.  A third was failing to complete a training course that she had explicitly asked him to take.  See id.

B.  Plaintiff's Objections to WASA Employment Practices

Central to Jones's retaliation claim are several instances in which he claims to have objected to allegedly discriminatory actions taken by WASA against employees other than himself.

1. *Charles Taylor*

The first incident occurred several months before Plaintiff's August and September 2011 reprimands.  It involved an employee named Charles Taylor, who had been acting as WASA's "Survey Party Chief" for "several years" up through early 2011.  See DSMF, ¶ 24; Opp. at 13. As Jones describes it, in January 2011, WASA decided to fill the position with a permanent

employee, and so it announced the vacancy.  See Opp., Attach. 1 (Declaration of Derek A. Jones), ¶ 73.  Taylor, who is black, applied.  See id.  Even though he had been acting Survey Party Chief for several years, WASA did not interview him for the job, and it ultimately selected a white male to fill the vacancy.  Id., ¶ 74-75.

Sometime before WASA completed the hiring process – although the record does not clearly state when – Taylor sued WASA for discrimination.  See MSJ at 8; DSMF, ¶ 24.  In May 2011, while the suit was pending, Jones learned from Taylor that he had not been interviewed for the job.  See Jones Decl., ¶¶ 74; DSMF, ¶ 24.  Jones then raised the issue with Jeter-Williams and Tiffany Walker, the recruiter assigned to manage the Survey Party Chief recruitment process.  See Jones Decl., ¶ 77; DSMF, ¶ 24.  Like Jeter-Williams, Walker is also black.  See Jones Depo. at 57:13-18.  He claimed that WASA's failure to consider Taylor for the job "was going to give [Taylor] more grounds to sue WASA, and help to prove his case against [it]." DSMF, ¶ 24 (quoting Jones Response to Interrogatory 12); see id. ("I told [Jeter-Williams] that Charles Taylor was already suing WASA, so if she refused to interview him . . . it could be considered as retaliation.").  Plaintiff, "based on [his] own knowledge," believed that Taylor was the superior candidate for the position, see Jones Decl., ¶ 75, and that race played a role in WASA's decision not to interview him.  See Jones Depo. at 56:2-15 ("[T]his was another example where minorities that were applying for position weren't being considered.").  Jones acknowledges, however, that he was not involved in the recruitment process, and that he did not recall the qualifications of the candidates who were interviewed for the position.  See Jones Depo. at 60:1-63:3.

2.  *Jessica Simmons*

Only a few weeks after issuing Jones a formal reprimand in her September 2011

memorandum, and a month before he was fired, Jeter-Williams asked Plaintiff to handle a

specific recruitment matter relating to a black WASA employee named Jessica Simmons. Jeter-

Williams's boss, Green, wanted Simmons to take an employment test for the "Executive

Assistant I" position. See DSMF, ¶¶ 17; MSJ, Attach. 7 (Sept. 28-29, 2011, Email Chain) at 5

("Denyse: Please schedule an Executive Assistant I Test for Jessica Simmons. She is being

considered for a new EAI position, reporting to Aklile."). He directed his request to Jeter-

Williams, who then forwarded it to Jones to execute. See Sept. 28-29, 2011, Email Chain at 4

("Derek . . . please test Jessica.").

But Jones pushed back, suggesting in an email to Jeter-Williams that he would not test

Simmons until the position was officially "post[ed]" and Simmons "appl[ied] for it." Id. at 4.

Jeter-Williams repeated her directive to test Simmons, and Plaintiff again balked, asserting that

such a course was contrary to WASA policy. "[W]e never give a test to an employee just to see

if they will pass," he wrote, explaining that "[t]est[s] are given to applicants that submit an

application for an announced position," which apparently this was not. Id. at 3 (emphasis

added); see id. ("I personally request to be out of the loop regarding testing Jessica. . . . [as t]he

current process gives the appearances that testing someone prior to announcing a position is a

predetermination.").

For a third time, Jeter-Williams instructed Jones to conduct the test, explaining in some

detail why testing Simmons was not contrary to WASA policy; at last Jones relented, albeit

grudgingly. See id. at 1-2 ("Denyse, As my supervisor I respect your position and I aim to

complete the work you delegate and assign to me however when you ask me to do something

that I feel is against policy then it is my moral obligation to inform you of such . . . ."). In doing

so, however, he took additional steps – beyond what had been requested of him – that appeared

to work at cross-purposes with what his superiors were trying to accomplish.  Specifically,

because he wanted to have an application on file from Simmons, he asked her to apply for one of

the listed Executive Assistant 1 slots, even though none of those positions was the one that

Jones's supervisors believed she might fill.  According to Jeter-Williams, he should not have

done that of his own accord.  See id. at 1 ("You told me that you asked Jessica to apply for one

of the current EA positions . . . although she had NOT expressed an interest in one of

[them] . . . [and] that your reason for doing so was to have her complete an application. . . .  [I]

reminded you that we do not instruct anyone to apply for a position unless they have expressed

an interest in [it].").

Importantly, although Jones consistently maintained that testing Simmons was contrary

to WASA policy – and perhaps a violation of its union contract – at no point did he tell his

employer that this course of action constituted discrimination.  See Jones Depo. at 366:7-9 ("Q:

In this email, you didn't mention anything about race.  Correct?  A: No, I did not."); DSMF, ¶ 24

(quoting Jones Resp. to Interrogatory No. 12).  In addition, even though he maintains that the

decision to "pretest" employees is "unfair to minorities," he ultimately agreed in his deposition

that such actions affected minorities and non-minorities equally.  See Jones Depo. at 145:8-

146:3.

C.  Termination and Procedural History

On October 14, 2011 – a month after the Simmons-related email exchange – WASA

terminated Plaintiff.  See DSMF, ¶ 22.  In a memorandum issued to Jones that day, Green wrote

that Jones's "challenge[] [to their] request" to test Simmons was another example of his

"disregard[ing] a directive" and "demonstrating unacceptable behavior by refusing to comply"

with his supervisors' commands.  See MSJ, Attach. 19 (Oct. 14, 2011, Memorandum) at 1.

Green emphasized the same patterns of behavior that had been the subject of prior admonishments in notes to Jones's file and in performance reviews.  See id.

Jones filed suit about a year later, alleging wrongful termination under state law and retaliation in violation of § 1981 of the Civil Rights Act of 1866, Title VII of the Civil Rights Act of 1964, and the D.C. Human Rights Act.  Although the procedural history of this case is complicated – involving, e.g., Plaintiff's interlocutory appeal that was dismissed for lack of prosecution, see ECF No. 53 (Mandate) – the Court need not recount the particulars.  Suffice it to say that Jones's wrongful-termination cause of action was dismissed in 2013, see Jones v. D.C. Water & Sewer Auth., 963 F. Supp. 2d 17, 20 (D.D.C. 2013), leaving only his retaliation claims, on which Defendant moved for summary judgment in May 2015.  See ECF No. 57.  When Plaintiff failed to oppose the Motion – even after receiving no fewer than four extensions – the Court treated the Motion as conceded and granted judgment in WASA's favor.  See ECF No. 63. Jones then filed a motion to reconsider and attached his overdue Opposition.  Endeavoring to resolve the matter on its merits, the Court vacated the judgment, reopened the case, and allowed WASA an opportunity to file a Reply.  See Order of Nov. 2, 2015 (ECF No. 72).  Now, once again before the Court is WASA's May 2015 Motion for Summary Judgment, which it will grant in full.

## II.     Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at

895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor.  See Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  In light of this requirement, and pursuant to Local Civil Rule 7(h) and Federal Rule 56(c), the Court, in resolving summary-judgment motions, "assume[s] that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  LCvR 7(h)(1).

10

**III.    Analysis**

A single question is presented here: on the record before the Court, could a reasonable jury conclude that WASA retaliated against Plaintiff for having complained about violations of other employees' protected "rights"?  Because the Court concludes that one of these acts of advocacy was not protected activity, and because Plaintiff has not meaningfully disputed or rebutted Defendant's justification for firing him, it will grant the Motion.

A.  Retaliation Standard

All three statutes invoked by Plaintiff – Title VII, § 1981, and the DCHRA – bar employers from retaliating against employees for opposing any unlawful, discriminatory practices.  See 42 U.S.C. § 2000e-3(a) (Title VII); 42 U.S.C. § 1981 (as interpreted by CBOCS W., Inc. v. Humphries, 553 U.S. 442 (2008)); D.C. Code § 2-1402.61.  While the precise wording of the statutory provisions – or, in the case of § 1981, a judicial gloss on statutory text – may differ among the three, courts have treated the elements, burdens of production and persuasion, and defenses as "essentially the same."  Harris v. D.C. Water & Sewer Auth., 791 F.3d 65, 68 (D.C. Cir. 2015) (analyzing Title VII and § 1981 claims together) (citation and internal quotation marks omitted); see Burley v. Nat'l Passenger Rail Corp., 801 F.3d 290, 296 (D.C. Cir. 2015) (plaintiff's Title VII and DCHRA claims "rise and fall together"); Vogel v. D.C. Office of Planning, 944 A.2d 456, 463 n.12 (D.C. 2008) ("We have construed [DCHRA] to guarantee employees the same protection from retaliation as is provided by the so-called 'opposition clause' in Title VII . . . .").

Relying on this precedent, both parties use Title VII's anti-retaliation provisions as the framework for all three statutes.  See MSJ at 7 n.2; Opp. at 12.  In a typical Title VII case, the plaintiff is required to make out a *prima facie* case of discrimination, meaning he "must show:

(1) that he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against him; and (3) that the employer took the action 'because' the employee opposed the practice."   Harris, 791 F.3d at 68 (citation and quotation marks omitted).

Where an employer avers that it has "legitimate, non-retaliatory reason[s] for the challenged action," as WASA has done here, then "the burden-shifting framework falls away, and the 'central question' becomes whether 'the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted . . . [ . . . non-retaliatory] reason was not the actual reason and that the employer intentionally . . . [ . . . retaliated] against the employee.'" Allen v. Johnson, 795 F.3d 34, 39 (D.C. Cir. 2015) (quoting Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008)); accord Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009) (Once defendant "asserted its legitimate non-retaliatory explanation . . . the district court should have proceeded to the ultimate issue of retaliation *vel non* instead of evaluating whether Jones made out a *prima face* case.").

That is not to say that evidence of a *prima facie* case of retaliation is wholly shunted from the inquiry on a motion for summary judgment.  On the contrary, in answering the sufficient-evidence question, the Court must consider "the total circumstances of the case," including strengths and weaknesses in "the plaintiff's *prima facie* case," along with other evidence adduced by both parties during discovery.  See Evans v. Sebelius, 716 F.3d 617, 620 (D.C. Cir. 2013) (citing Hamilton v. Geithner, 666 F.3d 1344, 1351 (D.C. Cir. 2012)); Allen, 795 F.3d at 39 n.4 ("To say that the burden-shifting framework falls away under Brady is not to suggest that the evidence supporting the *prima facie* case loses relevance."); accord Grosdidier v. Broad. Bd. of Governors, Chairman, 709 F.3d 19, 25 (D.C. Cir. 2013).

This is all fine and well, but there is one small wrinkle in bundling together Plaintiff's

statutory trifecta and treating it as indistinguishable – namely, causation.  In <u>Univ. of Texas Sw.</u>

<u>Med. Ctr. v. Nassar</u>, --- U.S. ----, 133 S. Ct. 2517 (2013), the Supreme Court clarified that "Title

VII retaliation claims require proof that the desire to retaliate was the <u>but-for cause</u> of the

challenged employment action." <u>Id.</u> at 2528 (emphasis added).  That differs considerably from

what is required under Title VII's <u>status-based</u> discrimination provision, which demands only

that plaintiffs demonstrate that "race, color, religion, sex, or national origin was <u>a motivating</u>

<u>factor</u> for any employment practice, even though other factors" contributed.  42 U.S.C. § 2000e-

2(m) (emphasis added); <u>see</u> <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 101-02 (2003).

Since <u>Nassar</u>, neither the Supreme Court nor the D.C. Circuit has stated whether the "but

for" causation standard also carries over to retaliation claims brought under § 1981.  Given that

<u>Nassar</u> grounded much of its determination in a close reading of Title VII's text, there is good

reason to conclude that its holding is confined to that statute.  <u>See</u> <u>Battle v. Truland Sys. Corp.</u>,

30 F. Supp. 3d 9, 24 n.8 (D.D.C. 2014) (opining that <u>Nassar</u>'s reasoning was "based on the

specific language and structure of Title VII, as distinguished from other anti-discrimination and

retaliation laws, including § 1981" but declining to decide whether it applied to the latter statute);

<u>but see, e.g.</u>, <u>Wright v. St. Vincent Health Sys.</u>, 730 F.3d 732, 738 n.5 (8th Cir. 2013) ("[I]t is

now definitively established that the determining-factor standard logically must be met in both

Title VII and § 1981 retaliation cases."); <u>Barker v. Computer Sci. Corp.</u>, No. 13-857, 2015 WL

1442864, at *7 (E.D. Va. Mar. 27, 2015) ("appl[ying] <u>Nassar</u>'s but-for causation requirement to

§ 1981 retaliation claims"), <u>aff'd</u>, 612 F. App'x 698 (4th Cir. 2015).  Notwithstanding decisions

in other Circuits, it remains an open question here.

In a similar vein, neither the D.C. Court of Appeals nor the D.C. Circuit has weighed in

on whether <u>Nassar</u> in any way altered the causation standard under the DCHRA's retaliation

provision.  To date, D.C. courts have not required "but for" causation, but instead have used a

standard comparable to the "motivating factor" test.  See <u>Arthur Young & Co. v. Sutherland</u>, 631

A.2d 354, 369 (D.C. 1993) ("[T]he fact that [defendant] had a legitimate business reason for its

decision . . . did not necessarily insulate it from liability for retaliation"; rather, plaintiff must

show that "a desire to penalize the assertion of rights protected under the DCHRA 'was a

substantial contributing factor in [Defendant's] decision" to engage in the challenged acts.").

Apart from the historical practice of having DCHRA claims piggyback on Title VII ones, there is

little to suggest that the law necessarily follows the same jurisprudential developments of its

federal counterpart.  <u>But see Martin v. D.C.</u>, 78 F. Supp. 3d 279, 315 (D.D.C. 2015) (applying,

without analysis, the "but for" standard to DCHRA); <u>Slate v. Pub. Def. Serv. for the D.C.</u>, 31 F.

Supp. 3d 277, 309 (D.D.C. 2014) (same).

Fortunately, the causation question is ultimately academic, for even if the Court adopted

a more lenient standard for Jones's DCHRA and § 1981 claims, no reasonable jury could find

that a desire to retaliate motivated WASA's decision to terminate him.

B.  <u>Protected Activity</u>

1.  *Taylor and Simmons*

Bearing the appropriate standards in mind, the Court now moves to the merits.  WASA's

first line of attack is to argue that neither of the two incidents Jones cites as "protected activity" –

namely, his complaints involving Taylor and Simmons – constituted "oppos[ing] a practice made

unlawful by" the civil-rights laws.  <u>See Harris</u>, 791 F.3d at 68.

WASA's instincts are sound, at least as to whether the steps Jones took regarding

<u>Simmons</u> constituted protected activity and thus whether he has furnished sufficient evidence to

conclude that WASA retaliated on that basis.  "An employee's opposition to an employment

practice is protected under Title VII when the employee 'reasonably and in good faith believed [the practice] was unlawful under the statute.'" <u>Grosdidier</u>, 709 F.3d at 24 (quoting <u>McGrath v. Clinton</u>, 666 F.3d 1377, 1380 (D.C. Cir. 2012)).  As Jones himself agreed in his deposition, however, in his email discussions with Jeter-Williams regarding Simmons's testing, he never opposed "pretesting" or "preselecting" candidates for unannounced positions on the ground that it constituted race discrimination.  <u>See</u> Jones Depo. at 366:7-9.  In addition, in response to an interrogatory from WASA asking Plaintiff to "[i]dentify all facts you believe support your allegation that you were terminated in retaliation for making statements that Defendant was engaging in practices that were racially discriminatory," DSMF, ¶ 24, Jones neglected to state that he ever opposed the testing on the ground that it constituted discrimination:

> I told Ms. Jeter-Williams that allowing Jessica Simmons to take the Executive Assistant I test in the absence of an announced vacancy for such a position would be a violation of the union contract, and was also the kind of action which minorities were already complaining about.

<u>Id.</u>  Although he claimed that he believed minorities at WASA were harmed by such practices, he ultimately agreed that pretesting or preselection harmed all WASA employees uniformly.  <u>See</u> Jones Depo. at 145:21-146:1 ("Q: But in this instance, [the practice of preselecting] wasn't just [affecting] minorities, it would have been everyone. Right? A: Yes, it would have been everyone."); <u>id.</u> at 209:6-10 ("Q: So anybody who was an incumbent [applicant for an administrative position] would be impacted by [preselection].  A: Yes, they would. Q: No matter what their race is?  A: No matter what their race is.").

Even viewing the evidence most favorably to Jones, he offers no basis from which a jury could conclude that a reasonable employee would have believed that WASA's actions toward Simmons constituted unlawful discrimination.  <u>See</u> <u>Grosdidier</u>, 709 F.3d at 24 (affirming

summary judgment for employer on hostile-work-environment retaliation claim where "there

was no evidence from which to find that a reasonable employee could have believed" that the

practices she complained of were unlawful under Title VII); Oliver-Simon v. Nicholson, 384 F.

Supp. 2d 298, 310 (D.D.C. 2005) ("Although pre-selection sheds light on an employer's

motivation for a hiring decision, where there is no evidence that pre-selection is based on a

motive prohibited by Title VII . . . , the conduct is not actionable."). He therefore has no basis

for arguing that, to the extent his firing resulted from his objections to pretesting Simmons, it

was unlawful under the civil-rights laws' anti-reprisal provisions. See Hunter v. D.C., 905 F.

Supp. 2d 364, 380 (D.D.C. 2012) ("Since the Court finds no evidence that plaintiff engaged in

activity that is protected under Title VII prior to the allegedly retaliatory actions, it cannot find

that the actions were taken in retaliation for protected activity.").

　　　　Turning to the steps Plaintiff took regarding Taylor, the question of whether he engaged

in protected activity is a closer call. To be sure, Jones has adduced almost no evidence – apart

from his own testimony – supporting his claim that WASA discriminated against Taylor by

refusing to interview or hire him as Survey Party Chief. He admits that he was not involved in

hiring for that position, and that he knew little to nothing about the pool of candidates being

considered. When asked at his deposition, "Do you know who was considered for the position

[of Survey Chief]," he responded that he knew who was ultimately selected but "that's about the

most I know about it after that, because I -- I really wasn't directly involved in recruiting for it in

the first place." Jones Depo. at 56:16-57:1; see id. at 57:6-10 ("Q: Was [the person ultimately

selected] the only person being considered for the position? A: That, I can't say, because I wasn't

part of the recruitment process.").

　　　　At the same time, however, Jones also testified that he did at least peruse some of the

candidates' resumes, and that, in his opinion, they were in some ways less qualified than Taylor.

See id. at 59:15-60:13 ("You could open up everybody's resume and basically see [them]. . . .");

id. at 61:13-62:14 ("A: . . . I opened up [other applicants'] resumes to only see that Charlie

[Taylor] could have easily been interviewed in this situation. . . .  Q: But for those individuals . . .

do you remember . . . where they were working?  A: Not exactly, no.  Q: Or how long they had

been at those jobs?  A: Not exactly. I mean, it['s] not like I studied it . . . I just did a scan-

through, you know, like you randomly would, just to say, 'Okay. What's going on here?'").

Giving Jones the benefit of all reasonable inferences, a jury could conceivably conclude

that his objections to WASA's refusal to interview Taylor constituted protected activity under

Title VII.  See Grosdidier, 709 F.3d at 24.  Such a determination, of course, does not include any

consideration of the question of whether WASA's decision to fire him was pretextual, which is

what the Court must analyze next.  Before doing so, however, it dispenses with several new

allegations raised for the first time in Plaintiff's Opposition.

### 2. *New Allegations*

In his Opposition, Jones identifies two new incidents that he alleges constituted protected

activity.  First, he says that in April 2011, he complained to supervisors that WASA might have

violated Title VII by hiring an unqualified white candidate (Steve Caldwell) instead of a black

candidate he believed to be properly qualified (James McQueen).  See Opp. at 12-13.  Second, he

claims that in "August or September 2011," shortly before his firing, he said something to his

supervisors (he does not specify what) about "WASA . . . leaving itself open to a discrimination

complaint" regarding its treatment of a woman named Bernetta Vaughan.  See id. at 13.  He

attaches a declaration to his Opposition in order to provide record support of these incidents.  See

Jones Decl., ¶¶ 79-88, 93-104.

In his Second Amended Complaint, however, neither of these individuals or incidents are mentioned, despite the fact that Plaintiff identifies with specificity four other incidents in which he complained that WASA was either engaging in unlawful discrimination or violating its employment policies. Two of these named incidents concern Taylor and Simmons, and the other two relate to individuals who make no appearance beyond their fleeting role in the Second Amended Complaint. See Sec. Am. Compl., ¶¶ 16-17, 18-22, 25-26, 29-33. (The Court thus presumes that the latter allegations have been abandoned.) While he did allege that, during a meeting with Green and Jeter-Williams, he "expressed concern that there were numerous employment discrimination complaints against WASA, and . . . then listed some of the employment practices WASA . . . [was] engaging in which served to give validity to the complaints of discrimination," id., ¶ 37, he offered no further specifics.

During discovery, Defendant unsurprisingly sought to gain clarity on this issue, asking him to "[i]dentify all facts . . . support[ing] your allegation that you were terminated in retaliation for making statements that Defendant was engaging in [discriminatory practices]." MSJ, Attach. 8 (Plaintiff's Resp. to Defendant's First Set of Interrogatories) at 9 (emphasis added). Jones's response, which was signed under penalty of perjury, was carefully limited to only two incidents: those involving Simmons and Taylor. See id. at 9-10 & 12-13. Undeniably, Plaintiff did mention Caldwell's name in response to a different interrogatory, which asked for "all persons . . . who possess knowledge pertaining to any fact or issue involved in this case . . . ." Pl. Interrog. Resp. at 2. But Jones has not identified any document, portion of his deposition testimony, or other evidence produced during discovery showing that these other unmentioned complaints of discrimination took place.

Instead, by raising these allegations in a declaration attached to his Opposition, Plaintiff

is attempting to stave off summary judgment by submitting what he hopes will create a late-breaking dispute of material fact.  But the D.C. Circuit, like most of its sisters, prohibits such a practice.  It follows what is known as the "sham affidavit" rule, which provides that a party cannot "creat[e] an issue of material fact by contradicting prior sworn testimony unless . . . '[it] offer[s] persuasive reasons for believing the supposed correction' is more accurate than the prior testimony."  Galvin v. Eli Lilly & Co., 488 F.3d 1026, 1030 (D.C. Cir. 2007) (quoting Pyramid Sec. Ltd. v. IB Resolution, Inc., 924 F.2d 1114, 1123 (D.C. Cir. 1991)); accord Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc., 5 F.3d 1255, 1264 (9th Cir. 1993) (noting that the rule "applies to conflicts between affidavits and interrogatory responses as well as deposition testimony").  With Jones having failed to offer any reason why his post-deposition declaration should be credited over his sworn interrogatory responses, the Court concludes that it is insufficient to bolster his allegations about what protected activity Jones engaged in while employed by WASA.  See Huthnance v. D.C., 255 F.R.D. 297, 300 (D.D.C. 2008) ("[I]nterrogatories serve not only as a discovery device but as a means of producing admissible evidence; there is no better example of an admission of a party opponent, which is admissible because it is not hearsay, than an answer to an interrogatory.") (citations and internal quotation marks omitted).

Although the Court will thus disregard the incidents involving McQueen and Vaughan in deciding whether summary judgment is proper, it is apparent that, even were the Court to credit them, Jones nevertheless fails to offer any evidence that WASA's stated reasons for firing him were pretextual, as the discussion below confirms.

C.  Pretext

In addition to questioning Jones's *prima facie* case, WASA asserts several legitimate,

non-retaliatory reasons for firing him: three years of run-of-the-mill performance reviews, repeated instances of insubordination, and disrespectful behavior towards his supervisors. See Mot. at 1; DSMF, ¶ 22. With Defendant having proffered these reasons, Jones must, to survive summary judgment, identify evidence that "raise[s] an inference that the employer's purpose" in firing him "was retaliatory." Allen, 795 F.3d at 39-40. He may do so "by pointing to evidence attacking the employer's proffered reasons" and by adducing "other evidence, if any, suggesting that retaliation was the real reason" for his firing. Id. at 40 ("Whether the available evidence suffices to support a jury finding of retaliation will, necessarily, be a contextual judgment.").

Jones makes only two arguments in asserting that WASA's stated reasons for firing him are pretextual. First, he quibbles with one portion of his negative performance appraisals – namely, that he "failed to complete his work on time." Opp. at 14. In other words, he attempts to "discredit[] [his] employer's asserted reason" for his firing, which, if successful, could be "quite probative of discrimination." Brady, 520 F.3d at 496 n.4. He focuses in particular on WASA's claim that he failed to complete his monthly reports on time, which he claims is not true. This argument plays an obvious semantic trick: WASA's complaint was not that he failed to complete the reports on time, but rather that he repeatedly refused to send them to his supervisor as she explicitly requested. See, e.g., July 8, 2011, Email Chain; April 2011 Memo (citing Jones's routine failure to "provide [Jeter-Williams] with a copy of [the monthly Budget/Recruitment report for Compensation]"). This may seem a petty difference, but as Jeter-Williams explained to him, "You save [the report] to the 'I' drive for future reference, but I need this report each month as soon as you complete it. Currently I am not aware when you've completed it which has created problems for me." July 8, 2011, Email Chain.

On the same issue, he also claims that it was Jeter-Williams's responsibility to prepare

the report, thus suggesting that any deficiencies in <u>his</u> performance on that front cannot serve as a basis for his firing.  <u>See</u> Opp. at 14-15.  But the evidence affords only one conclusion: it was Jones's responsibility, not Jeter-Williams's.  His performance evaluations and disciplinary memoranda routinely referred to the monthly report as <u>his</u> job.  <u>See, e.g.</u>, MSJ, Attach. 14 (May 21, 2009, Memorandum); <u>id.</u>, Attach. 15 (Dec. 2009 Performance Management Plan and Evaluation) at ECF p. 6; <u>id.</u>, Attach. 16 (April 13, 2011, Memorandum) at ECF p. 2.  And even though Jones challenges some of those documents' depictions of his <u>behavior</u>, he nowhere disputes that they accurately describe his responsibilities.  <u>See</u> Pl. Resp. to DSMF, ¶¶ 8-10.  The only evidence he cites in support of his argument – the declaration of a former coworker that he attaches to his Opposition, <u>see</u> Linden Decl. – does not actually dispute that it was Plaintiff's duty to prepare the report.  While Linden indicates that Jeter-Williams's predecessor used to prepare the report without relying on his or her subordinates, <u>see id.</u>, ¶ 10, he also explicitly states that "Jeter-Williams delegated to . . . Jones the responsibility of preparing the . . . report," <u>id.</u>, ¶ 12, and that, thereafter, "Derek Jones and I were responsible for the monthly staffing report."  <u>Id.</u>, ¶ 17.  Jones does not argue that Jeter-Williams's delegation was somehow improper or that, once delegated, it was not properly his task.

The larger problem with Plaintiff's argument about the report, however, is that it is far too narrow to make any difference, given WASA's other stated reasons for his firing.  Jones simply does not deny or even attempt to rebut these additional criticisms, which include his substandard communication skills, refusal to obey his supervisor's directives, and disrespectful behavior.  In his deposition, Plaintiff agreed that some of the unspecified actions his employer viewed as insubordination occurred, even though he insists that he had good reason to act the way he did:

> Q: . . . [Do] you disagree that the instances where Ms. Williams asked you to do something and you pushed back on doing it were insubordination?
> A: Yes, I disagree.
> Q: And why do you disagree?
> A: Because I gave her justification, in terms of the consider, why we couldn't do certain things, in terms of the choice to make and why -- how the results would affect us if I carried it out.

Jones Depo. at 248:14-249:2.  Nor does he dispute that other more specific behaviors occurred – *e.g.*, his consistent refusal to email a budget as requested by Jeter-Williams, his failure to obtain her permission to be absent from work to attend a defensive-driving course, and his prolonged refusal to obey her instruction to test Simmons.  And even though he does dispute <u>some</u> of the factual allegations recited in the disciplinary notes in his file (albeit without any specificity), <u>see</u> Pl. Resp. to DSMF, ¶¶ 5, 6, 8, 11, 13, 14, 22, he never suggests that his superiors lacked a good-faith and reasonable belief that the actions forming the basis for his firing transpired.  <u>See</u> <u>Brady</u>, 520 F.3d at 289 ("The question is not whether the underlying [facts warranting termination] occurred; rather, the issue is whether <u>the employer honestly and reasonably believed</u> that [it] occurred.").  An employee cannot "automatically obtain a jury trial" simply by "deny[ing] the underlying allegation of misconduct."  <u>Id.</u>

His second argument – that because some of his performance reviews were neutral or positive, his firing must have been pretextual – fares no better.  <u>See</u> Opp. at 15; <u>see also</u> PSMF, ¶¶ 11-16.  This logic wholly ignores the main culprit: his unrebutted record of disrespect and insubordination.  Even assuming he performed well at times, his track record also reflected behaviors and traits that warranted termination.

Jones has not identified any direct or circumstantial evidence that would raise an inference that his firing was motivated by impermissible retaliation.  He does not, for instance, point to any similarly situated employees who were treated better than he was.  <u>See</u> <u>Allen</u>, 795

F.3d at 40.  He does not argue or provide any evidence that WASA is "lying about the underlying facts" leading to its decision, that "there were changes and inconsistencies" in its explanation for why it fired him, that WASA "failed to follow established procedures or criteria" in doing so, or that it otherwise made "an error too obvious to be unintentional."  Id. (citations and quotation marks omitted).  In sum, he does not offer anything tangible to suggest that WASA's "proffered reasons are 'unworthy of credence.'"  Id. (quoting Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009)).

As the D.C. Circuit has cautioned, Title VII requires courts "to be vigilant in smoking out unlawful motives while remaining 'reluctan[t] to become involved in the micromanagement of everyday employment decisions.'"  Allen, 795 F.3d at 41 (quoting Forman v. Small, 271 F.3d 285, 291 (D.C. Cir. 2001)).  With no evidence suggesting even a whiff of retaliatory motive, the Court sees no reason to put the question before a jury.

## IV.    Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment and enter judgment in its favor.  A contemporaneous Order will so state.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  February 18, 2016